UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BRUCE WHITEHEAD,

      Plaintiff,

v.                              Case No: 2:12-cv-197-FtM-29DNF

JACQUES LAMOUR, Dr., HUBERT
SMART, Lieutenant, HOWARD
EASTER, C.O., and E. WALKER,
TST,

      Defendants.

_____

**OPINION AND ORDER**

This matter comes before the Court upon the following:

> The motion for partial summary judgment filed Plaintiff Bruce Whitehead against Defendant Jacques Lamour (Doc. 74, filed May 12, 2014);
>
> Defendant Jacques Lamour's response in opposition to Plaintiff's motion for partial summary judgment (Doc. 80, filed June 17, 2014);
>
> The motion for summary judgment filed by Defendants Howard Easter, Jacques Lamour, Hubert Smart, and E. Walker (Doc. 76, filed May 16, 2014); and
>
> Plaintiff's response in opposition to Defendants' motion for summary judgment (Doc. 84, filed August 1, 2014).

Plaintiff Bruce Whitehead ("Plaintiff") initiated this action by filing a civil rights complaint pursuant to 42 U.S.C. § 1983 (Doc. 1). Plaintiff's amended complaint is currently before the Court (Doc. 17).

The claims raised in Plaintiff's amended complaint stem from events that occurred on March 12, 2009 at the Florida Civil Commitment Center ("FCCC") in Arcadia, Florida.   As discussed below, the Court concludes that Plaintiff's motion for partial summary judgment against Defendant Lamour is due to be denied. The motion for summary judgment filed by Defendants Smart, Easter, Walker, and Lamour is due to be granted.

I.   **Procedural History**

Plaintiff[1] initiated this case on April 5, 2012 by filing a complaint against Udayan Agrawal, Craig Beloff, Timothy Budz,

---

[1] Plaintiff is civilly detained at the Florida Civil Commitment Center pursuant to Florida's Involuntary Civil Commitment of Sexually Violent Predator's Act and is proceeding *pro se*.  The Florida legislature enacted the Sexually Violent Predators Act, Fla. Stat. §§ 394.910-.913, by which a person determined to be a sexually violent predator is required to be housed in a secure facility "for control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." Fla. Stat. § 394.917(2).  The Act was promulgated for the dual purpose "of providing mental health treatment to sexually violent predators and protecting the public from these individuals*."*  Westerheide v. State, 831 So. 2d 93, 112 (Fla. 2002); Kansas v. Hendricks, 521 U.S. 346 (1997) (holding that the Kansas Sexually Violent Predator Act did not establish criminal proceedings, and involuntary confinement pursuant to the Act was not punitive).

Civil commitment under the Act involves several steps. First, the Act requires a mental evaluation of any person who has committed a sexually violent offense and is scheduled for release from prison or involuntary confinement.  See Fla. Stat. § 394.913. The evaluation is conducted by a multi-disciplinary team of mental health professionals who must determine whether the individual meets the definition of a "sexually violent predator."  After the evaluation, the state attorney may file a petition with the circuit

Jorge Deminicus, Howard Easter, George Emanoilidis, Angel Garrido, Geo Group, Inc., Michael P. Hancock, Suzonne Kline, Jacques Lamour, Moiere Landais, Ron Lawrenz, Rex Richie, George Sheldon, Hubert Smart, FNU Walker, and Robin Wilson (Doc. 1).  Because Plaintiff raised unrelated claims in the complaint and failed to adequately state claims against some of the defendants, he was ordered to file an amended complaint if he wished to proceed (Doc. 14, filed October 31, 2012).

Plaintiff filed an amended complaint on December 26, 2012 in which he sued defendants Dr. Angel Garrido, Dr. Jacques Lamour, Hubert Smart, Howard Easter, Earl Walker, Dr. Michael P. Hancock, Dr. Udayan Agrawal, and Moliere Landais (Doc. 17).  Defendants Garrido, Hancock, Agrawal, and Landais were dismissed from this case due to Plaintiff's failure to state a claim against them. See

---

court alleging that the individual is a sexually violent predator subject to civil commitment under the Act.  Id.  If the judge determines the existence of probable cause that the individual is a sexually violent predator, then he or she will order the individual to remain in custody. Id. at § 394.915.  Thereafter, a jury trial, or a bench trial if neither party requests a jury trial, will commence.  Id.  If the jury finds the individual to be a sexually violent predator by clear and convincing evidence, then the individual will be committed to the custody of the Department of Children and Family Services for "control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." Id. at § 394.917.

Orders at Doc. 20, Doc. 66.   In this Order, the remaining Defendants shall be referred to collectively as "Defendants."

On December 17, 2013, Defendants were ordered to conduct discovery (Doc. 69).   Thereafter, Plaintiff filed a motion seeking partial summary judgment on all of his claims against Defendant Lamour (Doc. 74).   Defendants filed a motion seeking summary judgment in their favor on all of Plaintiff's claims (Doc. 76).

## II.   **Pleadings**

### A.   **Plaintiff's Amended Complaint**

All of Plaintiff's allegations in his amended complaint stem from an event that occurred on March 12, 2009 in which Plaintiff claims that excessive force was used against him and that the excessive force resulted in Plaintiff's broken hip.   The facts, as alleged in Plaintiff's amended complaint, are as follows:

Each defendant in this action knew, "or should have known by review of Plaintiff's Clinical File" that he suffers from Post-Traumatic Stress Disorder and Borderline Personality Disorder (Doc. 17 at ¶ 3).   On March 12, 2009, he was on suicide watch status which involved confinement in an 8.5 foot by 5.5 foot cell. Plaintiff asserts that his psychiatrist ordered that Plaintiff was allowed to leave the cell for bathroom breaks only, and then only when escorted by three security guards (Doc. 17 at ¶ 4; Doc. 17-4 at 2, 3).

- 4 -

On March 12, 2009, Plaintiff told Defendant Walker that he needed to use the restroom. Plaintiff was escorted to the restroom by Defendant Walker, Defendant Easter, and Defendant Smart (Doc. 17 at ¶ 5). While in the restroom, Plaintiff broke a towel rack from the wall, used the towel rack to smash a glass mirror, held a portion of the broken mirror to his throat, and threatened to cut himself if he was not taken outside for fresh air and a smoking break. Id. Plaintiff was escorted outside, and after smoking approximately half a cigarette, he dropped the broken mirror to the sidewalk. Id. Defendant Smart approached Plaintiff who "assertively requested Defendant Smart to respect him and that he be given his personal space." Id. Defendants Smart and Easter then walked towards Plaintiff "in an aggressive and threatening manner." Id. ¶ 6. Plaintiff felt threatened and ran away which involved climbing over the handrail surrounding the sidewalk. Id. He was pursued by Defendants Smart and Easter. Id. Defendant Smart "grabbed the Plaintiff from behind by the top of Plaintiff's shoulders with two hands, forcibly driving his right knee upwards, striking Plaintiff in the right lower back and hip area." Id. Plaintiff's and Smart's forward momentum caused Plaintiff to fall forward about 2.5 feet from a concrete ledge and caused Defendant Smart to land on top of Plaintiff. Id. at ¶¶ 6-7. Defendant Smart then forced Plaintiff's face into the dirt and screamed obscenities at him. Id.

Defendant Easter grabbed Plaintiff's right arm and forced it behind Plaintiff's back while Defendant Smart forced Plaintiff's left arm behind Plaintiff's back (Doc. 17 at ¶ 7). Plaintiff screamed in pain that his leg was broken, but Defendants Smart and Walker "picked up Plaintiff by his arms and forced him to his feet while continuing to disregard [his] screams" that his leg was broken." Id. at ¶ 8. Plaintiff was escorted to the medical building with his right foot and leg dragging the ground. Id.

Subsequent to his altercation with Defendants Smart and Easter, Defendant Lamour examined Plaintiff and ordered that he be taken to Desoto Memorial Hospital for further examination (Doc. 17 at ¶ 9). Plaintiff was taken to Desoto Memorial Hospital on the same day (March 12, 2009) (Doc. 17 at ¶ 11). At the hospital, Plaintiff's right hip was x-rayed, and he was told that the only injuries he had received were bruises even though he told the doctors at the hospital that he believed his leg to be broken (Doc. 17 at ¶ 11). Plaintiff was given medication for pain and was discharged from the hospital (Doc. 17 at ¶ 11). The next morning, Plaintiff was returned to his suicide watch isolation cell (Doc. 17 at ¶ 12).

On March 13, 2009, Desoto Memorial Hospital contacted the FCCC to advise of an "acute fracture of the right Ischium and likely the Acetabulum of the Plaintiff's right hip." (Doc. 17 at 13). Defendant Lamour "did not seek emergency medical care until

the evening of March 14, 2009[.]" (Doc. 17 at 13).  Plaintiff was admitted to the Tampa General Hospital on March 14, 2009 (Doc. 17 at 13).

Plaintiff seeks compensatory damages of $100,000 from each defendant and punitive damages "in amounts to be proven at trial" and all future medical expenses associated with any future injuries that may be associated with his hip injuries (Doc. 1 at 11).

Plaintiff has attached numerous documents in support of his amended complaint.  The documents relate generally to Plaintiff's classification as a sexually violent predator and his detention in a suicide watch cell.  He also attached the medical records relating to his broken hip (Doc. 17-6; Doc. 17-7; Doc. 17-8; Doc. 17-9) and sworn affidavits of FCCC residents William M. Vogt (Doc. 17-5 at 2-3) and Elwood Wise (Doc. 17-5 at 4-5).

**B.   Plaintiff's Motion for Partial Summary Judgment**

In Plaintiff's motion for partial summary judgment against Defendant Lamour he generally asserts that it not disputed that he (Plaintiff) suffered fractures to his right hip and that Defendant Lamour did not provide immediate emergency care after he learned of the extent of Plaintiff's injuries (Doc. 74).  Therefore, Plaintiff asserts, he has shown that "Defendant Lamour is liable for damages for deliberate indifference to a serious medical need and unnecessary wanton infection of pain[.]" (Doc. 74 at 5).

In support of his motion, Plaintiff relies on and cites to opinions from the Fourth, Fifth, Seven, Tenth, and Eleventh Courts of Appeal as well as a district court opinion from the Middle District of Alabama and a Massachusetts state court case (Doc. 74 at 9-10).  Plaintiff also attaches as exhibits Defendant Lamour's answers to interrogatories (Doc. 74-2, "Lamour's Interrog."); Plaintiff's affidavit (Doc. 74-3; "Plaintiff's First Aff."); and a number of Plaintiff's medical records regarding his hip injury (Doc. 74-3).[2]

In response to Plaintiff's motion for partial summary judgment, Defendant Lamour argues that the facts of this case demonstrate that summary judgment should be granted in his (Lamour's) favor (Doc. 80 at 2).  Defendant Lamour also addresses and distinguishes each of the cases cited by Plaintiff in support of his claims. Id. at 2-8.  In the interests of brevity, Defendant Lamour "adopts the arguments, case law and his own affidavit which were encompassed in the Defendants' Motion for Summary Judgment" (Doc. 80 at 2).

**C.   Defendants' Motion for Summary Judgment**

Defendants filed a motion for summary judgment in which they assert that Defendants Smart, Easter, and Walker used only the

---

[2] Plaintiff's medical records are also attached to his amended complaint (Doc. 17) and to Defendants' motion for summary judgment (Doc. 76).

amount of force necessary to control Plaintiff who posed a security threat to the FCCC (Doc. 76).   Defendant Lamour asserts that Plaintiff was provided with adequate and sound medical care while at the FCCC and that Plaintiff has failed to demonstrate that he (Lamour) acted with deliberate indifference to Plaintiff's serious medical needs. Id.

In support of their motion for summary judgment, Defendants attach to the motion: Affidavit of Defendant Smart (Doc. 76-1, "Smart Affidavit"); Affidavit of Howard Easter (Doc. 72-2, "Easter Affidavit"); Affidavit of Eddie Walker (Doc. 76-3, "Walker Affidavit"); Affidavit of Jacques Lamour, M.D. (Doc. 76-4, "Lamour Affidavit"); and Plaintiff's medical records from the FCCC, Tampa General Hospital, and Desoto Memorial Hospital (Doc. 76-5).

Plaintiff has responded to Defendants' motion for summary judgment by pointing out specific factual disputes and by attaching another of his own affidavits (Doc. 84-1, "Plaintiff's Second Affidavit").

## III. Legal Standards

### A.   Summary Judgment Standard

Summary judgment is appropriate only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The movant may meet this burden by presenting evidence that would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some elements of its case on which it bears the ultimate burden of proof. Id. at 322-324.

If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322, (1986).

The standard for creating a genuine dispute of fact requires courts to make all *reasonable* inferences in favor of the party opposing summary judgment, but it does not require the courts to make all *possible* inferences in the non-moving party's favor. <u>Chapman v. Al Transp.</u>, 229 F.3d 1012, 1013 (11th Cir. 2000). Moreover, a factual dispute alone is not sufficient to defeat a properly pleaded motion for summary judgment. Instead, "[o]nly factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment." <u>Lofton v. Sec'y Dep't of Children & Family Servs.</u>, 358 F.3d 804, 809 (11th Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)).

Finally, in the summary judgment context, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney. <u>Loren v. Sasser</u>, 309 F.3d 1296 (11th Cir. 2002).

## B.   Excessive Force Standard

Plaintiff is civilly committed, the FCCC is not a prison, and Plaintiff is not a prisoner. <u>Troville v. Venz</u>, 303 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has recognized that an individual who has been involuntarily civilly confined has liberty

interests under the Due Process Clause of the Fourteenth Amendment that "require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." Youngberg v. Romeo, 457 U.S. 307, 319 (1982). Thus, the Supreme Court has opined that, at least in regards to certain aspects of civil detainees' confinement, they are afforded a higher standard of care than those who are criminally committed.[3] Id. at 321–322; Dolihite v. Maughon, 74 F.3d 1027, 1041 (11th Cir. 1996) (holding that "persons subjected to involuntary civil commitment are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.")(quoting Youngberg, 457 U.S. at 322 (internal quotation omitted)); see also Lavender v. Kearney, 206 F. App'x 860, 863 (11th Cir. 2006).

This, however, does not mean that civil detainees are free to live within the FCCC without any restrictions or limitations. The FCCC residents, like pretrial detainees who are facing criminal charges or detainees confined in mental hospitals, are not entitled to the same unrestricted liberties as persons in the outside world. While residents may object to having to comply with the FCCC's rules and restrictions, or orders given by staff at the

---

[3] In Youngberg, the issue was whether a severely retarded young man had received proper treatment in a state facility. Id. at 309.

institution, neither the fact of their existence nor their imposition gives rise to a constitutional violation because such does not constitute punishment.    Indeed, the Supreme Court observed this point, opining in pertinent part, as follows:

> Once the Government has exercised its conceded authority to detain a person . . . it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial.  Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility.  And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

Bell v. Wolfish, 441 U.S. 520, 537 (1979).

The need to curtail potentially violent conduct is an "obligation" incumbent upon the operators of the FCCC.  Washington v. Harper, 494 U.S. 210, 225 (1990) (stressing that the state has not only an interest, but an obligation, to combat any danger posed by a person to himself or others, especially in an environment, which by definition is made up of persons with a demonstrated proclivity for antisocial criminal, and often violent, conduct). Consequently, staff at the FCCC are tasked with the arduous

responsibility of rendering treatment consistent with the goals of the SVP Act while ensuring the safety of not only themselves and other administrative personnel, but of all residents who are confined at the FCCC. The Supreme Court has recognized that the "interest in institutional security" and "internal security" is paramount. Hudson v. Palmer, 468 U.S. 517, 528 (1984).

Under the Eighth Amendment,[4] to establish an excessive use of force claim, a plaintiff must satisfy both an "objective" and a "subjective" prong. Smith, 373 F. App'x at 966 (citing Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). To meet the "objective" prong, the amount of force must be more than de minimis, provided that the type of force is not of the kind that

---

[4] The Eleventh Circuit recognizes that the Fourteenth Amendment protects pretrial detainees from the use of excessive force; however, because the Eighth Amendment standard is the same, "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996); see also Smith v. Vavoulis, 373 F. App'x 965, 966 (11th Cir. 2010); Williams v. Scott, 433 F. App'x 801 (11th Cir. 2011) (applying Cottrell in case involving FCCC resident alleging excessive use of force); but compare Enriquez v. Kearney, 694 F. Supp. 2d 1282, 1291–1292 (S.D. Fla. 2010) (recognizing that the Eighth Amendment's "malicious or sadistic" intent is at odds with the Fourteenth Amendment's punishment benchmark and evaluating claim under the "revised" test adopted in Telfair v. Gilbert, 868 F. Supp. 1396, 1404 (S.D. Ga. 1994), which requires a lesser showing of intent than that set forth by the Eighth Amendment. Namely, whether there is direct evidence that the use of force was intended to punish the detainee. If not, (1) whether a legitimate use of force is evident from the circumstances, and (2) if so, whether the force was necessary to further that interest. Telfair, 868 F. Supp. at 1412).

is "repugnant to the conscience of mankind." Hudson v. MacMillian, 503 U.S. 1, 10 (1992). To fulfill the "subjective" prong the plaintiff must demonstrate that the force was applied maliciously and sadistically for the purpose of causing harm. Smith, 373 F. App'x at 966. The court examines the following five factors when evaluating whether the force was applied maliciously and sadistically: (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them. Id.

### C.   Eighth Amendment Deliberate Indifference Standard

Deliberate indifference to the serious medical needs of a prisoner "constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976); see also Campbell v. Sikes, 169 F.3d 1353 (11th Cir. 1999). In order to state a claim for a violation under the Eighth Amendment, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106. This showing requires a plaintiff to satisfy both an objective and a subjective

inquiry. Farrow, 320 F.3d at 1243 (citing Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000)).

A plaintiff must first show that he had an "objectively serious medical need." Id.   "[A] serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Farrow, 320 F.3d at 1243 (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), abrogated in part on other grounds, Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002)).   In either situation, "the medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (citing Taylor, 221 F.3d at 1258) (alteration in original); see also Andujar v. Rodriquez, 486 F.3d 1199, 1203 (11th Cir. 2007) (finding that a condition involving more than "superficial" wounds, affecting ability to walk, and pain that caused crying was objectively, sufficiently serious).

Second, a plaintiff must establish that a defendant acted with "deliberate indifference" by showing: (1) subjective knowledge of a risk of serious harm (i.e., both awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and the actual drawing of the inference); (2) disregard of that risk; and (3) conduct that is more than gross negligence. Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005).

Inadvertence or mere negligence in failing to provide adequate medical care does not rise to a constitutional violation. Farrow, 320 F.3d at 1243.   Rather, "[m]edical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)).   Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. Id.

The Supreme Court has stated that decisions such as whether an x-ray, additional diagnostic techniques, or other forms of treatment are indicated are "[c]lassic example[s] of matters for medical judgment." Estelle, 429 U.S. at 107.   The course of treatment chosen by a medical official would appear to be such "a classic example of a matter for medical judgment." Id.   A complete denial of readily available treatment for a serious medical condition obviously constitutes deliberate indifference. Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994).   However, no constitutional violation exists where an inmate and a prison medical official merely disagree as to the proper course of medical treatment. Harris, 941 F.2d at 1505.

**IV.   Findings of Facts and Conclusions of Law**

Plaintiff alleges that Defendant Smart used unnecessary excessive force to subdue him and that Defendants' Easter and Walker helped him do so in violation of the Eighth and Fourteenth Amendments to the United States Constitution (Doc. 17 at 4). Plaintiff also alleges that Defendant Lamour, having knowledge of Plaintiff's injuries failed to expediently seek medical attention, demonstrating deliberate indifference to Plaintiff's serious medical needs. Id. at 5.  Each claim will be addressed separately.

### A. Defendants Smart, Easter, and Walker are entitled to summary judgment as a matter of law on Plaintiff's excessive force claims

#### 1. Material Facts

Most of the material facts surrounding the incident that led to Plaintiff's fractured hip are not in dispute.  On March 12, 2009, Plaintiff was on suicide watch, which meant that he was on "continuous uninterrupted observation." (Doc. 17 at 8; Doc. 76 at ¶ 2).  Plaintiff notified Defendant Walker that he needed to use the restroom, and he was escorted to the restroom by Defendants Walker, Easter, and Smart (Doc. 17 at 7).

While Plaintiff was in the restroom, he broke a towel rack from the wall and used the rack to smash a glass mirror (Doc. 17 at ¶ 5; Easter Aff. at ¶¶ 7-9; Walker Aff. at ¶ 7).  Plaintiff held a piece of the broken mirror to his own throat and threatened to cut himself if he was not taken outside (Doc. 17 at ¶ 5; Smart Aff. At ¶ 15; Easter Aff. At ¶ 14; Walker Aff. At ¶ 14).  Plaintiff

was escorted outside by Defendants Smart, Easter, and Walker (Doc. 17 at ¶ 5; Smart Aff. at ¶¶ 17-18; Easter Aff. at ¶ 17; Walker Aff. at ¶ 12).   Plaintiff felt threatened by Defendants Smart and Easter and crossed the handrail enclosing the sidewalk and attempted to run from the area (Doc. 17 at ¶ 6; Smart Aff. at ¶¶ 21-22; Easter Aff. at ¶¶ 19-20; Walker Aff. at ¶ 15-16).   Plaintiff was pursued by Defendant Smart who subdued Plaintiff by tackling him to the ground (Doc. 17 at ¶ 6-7; Smart Aff. at ¶ 22). Afterwards, Plaintiff was handcuffed by Defendants Smart and Easter (Doc. 17 at ¶ 7; Smart Aff. at ¶ 23; Easter Aff. at ¶ 22). Plaintiff was then escorted to the medical building for an assessment (Doc. 17 at ¶ 9; Smart Aff. at ¶ 24; Easter Aff. at ¶ 23; Walker Aff. at ¶ 23).

The areas of factual dispute in this case generally go to the necessity of force used by Defendant Smart in his tackle of Plaintiff and to whether or not the Plaintiff screamed in pain after he was taken to the ground.   The Plaintiff and Defendants Smart, Easter, and Walker also disagree as to whether Plaintiff was still holding broken glass in his hand at the time he jumped over the sidewalk railing and fled from them.

Plaintiff asserts that he dropped the glass in his hand after he was taken outside and after he had smoked half a cigarette, and when he did so, Defendant Smart approached him in an intimidating manner (Doc. 17 at ¶ 5).   Afterwards, Plaintiff "assertively

requested" that Defendant Smart "respect him" and give him his "personal space." Id.  Plaintiff's version of his flight and the ensuing tackle is as follows:

> At this time Lt. Smart and C.O. Easter walked stridently towards Plaintiff in an aggressive and threatening manner.  The Plaintiff, feeling threatened with physical harm by the Defendants, stepped over the handrail enclosing the sidewalk, and ran.  Lt. Smart and C.O. Easter pursued the Plaintiff a short distance.  Lt. Smart forcibly grabbed the Plaintiff from behind by the top of Plaintiff's shoulders with two hands, forcibly driving his right knee upwards, striking Plaintiff in the right lower back and hip area.  Lt. Smart continued through with his momentum and bodyweight causing Plaintiff to pitch face-forward from the top of a concrete ledge (*approximately 2.5 ft. in height*) slamming the Plaintiff to the ground (*a dirt and grass area*).
>
> Lt. Smart landed on top of the Plaintiff, still gripping the Plaintiff by the top of his shoulders, Lt. Smart's right knee still in the Plaintiff's lower right back and hip area. The type of hold, knee strike, and momentum combined with the body weight of Lt. Smart, forced Plaintiff into a backward bowed position subsequently fracturing the Plaintiff's right hip.

(Doc. 17 at ¶¶ 6-7).  Plaintiff asserts that he began to scream that his leg was broken after the tackle and that the defendants "dragged" him into the medical building thereafter (Doc. 17 at ¶ 8).[5]

---

[5] As discussed below, the Court concludes that Plaintiff has not stated an excessive force claim against any defendant based

Defendants Smart, Easter, and Walker each attest that Plaintiff was still holding broken glass in his hand when he began to run away.  They also attest that Plaintiff did not scream that his leg was broken and that Plaintiff was able to walk into the medical building (Smart Aff. at ¶¶ 21, 26-27; Easter Aff. at ¶¶ 25-26; Walker Aff. at ¶ 12, 24-25).  Finally, Defendants Smart, Easter, and Walker describe Plaintiff's actions and attempted flight as posing a serious security threat because he refused to obey orders and had held broken glass to his own throat (Smart. Aff. at ¶ 31; Easter Aff. at ¶ 29; Walker Aff. at ¶ 31).

### 2.   Application of law to facts

Neither the undisputed evidence nor the facts as alleged by Plaintiff show that any defendant acted maliciously and sadistically, or with the type of force that shocks the conscious such that it gives rise to a constitutional violation when they subdued Plaintiff after his outburst in the restroom.  See Smith, 373 F. App'x at 966.  Rather, the evidence shows that the defendants' actions were applied in a good faith effort to maintain

---

upon Plaintiff's tackle by Defendant Smart as he attempted to flee. See discussion infra Part IV(A)(2).  Likewise, although Plaintiff has labeled it as such, the facts regarding Plaintiff's escort to the medical building do not indicate that excessive force was used. Accordingly, reading Plaintiff's pro se amended complaint liberally and applying an abundance of caution, the Court will address Plaintiff's claim that Defendants Smart, Easter, and Walker ignored his cries of pain when they escorted him to the medical building as a claim for deliberate indifference rather than as a claim of excessive force.

or restore discipline after Plaintiff threatened to cut himself with a piece of broken glass and attempted to flee.

Although Plaintiff certainly suffered a significant injury from Defendant Smart's tackle after Plaintiff ran away, the undisputed evidence shows that Plaintiff initiated the confrontation by ripping a towel bar from the wall, using the bar to break a mirror, and threatening to cut himself with the mirror glass if he was not taken outside.  Plaintiff was told several times by the defendants to stop his aggressive behavior.  Instead, Plaintiff attempted to flee after he was taken outside.  The defendants were justified in believing that Plaintiff's actions posed a security threat.  Even if Plaintiff had indeed dropped the broken glass before he ran from the guards as he asserts in his amended complaint,[6] he has not presented evidence that the defendants were aware that he had done so or evidence that he no longer presented a security risk simply because he was no longer carrying glass.  In fact, Plaintiff's outburst in the restroom is evidence that he posed a serious risk of harm to himself if not restrained.

---

[6] The medical documents presented by both Plaintiff and Defendants show that Plaintiff was discovered by the medical staff holding glass in his hand in the infirmary *after* the incident (Doc. 76-5).

Defendants have presented evidence showing that Defendant Smart's purpose in applying force was to stop Plaintiff's flight and to prevent him from harming himself, staff members, or other FCCC residents.  In other words, Defendant Smart applied force in an attempt to *prevent* harm to Plaintiff, not to *cause* harm to Plaintiff.[7]  Thus, the fact that Defendant Smart's forward momentum after he grabbed Plaintiff's shoulders caused both Plaintiff and Defendant Smart to fall forward to the ground, breaking Plaintiff's hip, while unfortunate, does not show that Defendant Smart used excessive force or that Defendant Smart intended to harm Plaintiff.  See Wilkins v. Gaddy, 559 U.S. 34, 34 (2010) (recognizing that excessive force claims are decided based upon the nature of the force rather than the extent of the injury) (citing Hudson v. McMillian, 503 U.S. at 1); see also Fennell v. Gilstrap, 559 F.3d 1212, 1219 (11th Cir. 2009) (finding that officer did not use

---

[7] In his amended complaint, Plaintiff alleges that his clinical file indicates that he suffers from Post-Traumatic Stress Disorder and Borderline Personality Disorder (Doc. 17 at ¶ 3). Plaintiff urges that the defendants should have been familiar enough with his medical record to know of this diagnosis, and Plaintiff attaches documents to his complaint in support of this diagnosis (Doc. 17-4).  Upon review of Plaintiff's amended complaint, the Court notes that the medical records attached thereto include progress notes from Psychiatrist Garrido, indicating that "[t]his patient is a security risk.  He has had a prior history of violence." (Doc. 17-4 at 8).  If any defendant was familiar with Plaintiff's case history, as Plaintiff asserts they should have been, it would be further undisputed evidence that the defendants believed Plaintiff posed a security risk.

excessive force when he kicked the plaintiff in the face, despite the plaintiff's significant injuries because the undisputed evidence revealed that the officer intended to kick the plaintiff in the arm and did not foresee that his kick would land on the plaintiff's face); Cockrell v. Sparks, 510 F.3d 1307 (11th Cir. 2007) (guard who shoved inmate, causing him to fall and break his hip and wrist, was not liable for excessive force because the use of force was not applied in a malicious and sadistic fashion, but was a "good faith effort to maintain or restore discipline in a difficult situation.").

Likewise, that Defendant Easter assisted Defendant Smart by putting handcuffs on Plaintiff after he was tackled does not subject him to liability for excessive force.   The need for handcuffing Plaintiff is evidenced by Plaintiff's own admission that he ripped a towel bar from the wall, used the bar to break a mirror, threatened to cut himself with the broken mirror glass, and then fled when his guards approached him.   Plaintiff does not assert that Defendant Easter's actions in cuffing him caused or exacerbated his hip injuries. Rather, Plaintiff merely states that Defendant Smart "forcibly twisted the left arm of the Plaintiff behind Plaintiff's back." (Doc. 17 at 9).   "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins, 559 U.S. at 37 (citing Hudson v. McMillian, 503 U.S. at

9).  Plaintiff has failed to produce any evidence that Defendant Easter acted maliciously and sadistically in cuffing him.

Finally, Plaintiff's amended complaint makes no allegation that Defendant Walker used force against him at all, much less excessive force, during Plaintiff's outburst, suicide threat, or flight.  Consequently, based upon the record before the Court, the undisputed material facts, and the applicable law, the Court concludes that Defendants Smart, Easter, and Walker are entitled to summary judgment on Plaintiff's excessive force claims as a matter of law.

### B. Defendants Smart, Easter, and Walker are entitled to summary judgment as a matter of law on Plaintiff's deliberate indifference claims

#### 1. Material facts

Plaintiff and the defendants agree that immediately after Plaintiff was tackled by Defendant Smart and handcuffed by Defendants Smart and Easter, he was pulled to his feet and escorted to the medical department by Defendants Smart and Walker. Plaintiff asserts that Defendants Smart and Walker "picked up the Plaintiff by his arms and forced him to his feet" and took him to the medical building even though he was screaming that his leg was broken. Plaintiff asserts that his right foot and leg dragged the ground behind him during the escort (Doc. 17 at ¶ 8).

In their affidavits, Defendants Smart, Easter, and Walker attest that: Plaintiff walked into the medical department; they

did not "drag" Plaintiff to medical; and Plaintiff did not scream
that his leg was broken (Smart Aff. at ¶¶ 24-27; Easter Aff. at ¶¶
24-26; Walker Aff. at ¶¶ 24-25).   Plaintiff has attached the
affidavit of FCCC resident Elwood Wise who attests that Plaintiff
was escorted to the medical building "with his right foot and leg
dragging the ground." (Doc. 17-5).   He also attached the affidavit
of FCCC resident William M. Vogt who attests that Plaintiff was
screaming in pain after he was tackled by Defendant Smart. Id.

### 2.   Application of law to facts

Because Plaintiff has submitted admissible evidence refuting
the defendants' statements that Plaintiff never screamed that his
leg was broken or that his foot dragged the ground, for the purpose
of this Order, the Court will assume that Plaintiff began screaming
after he was tackled by Defendant Smart and that he dragged his
right foot as he was escorted to the medical building.   Even so,
the record does not show that any defendant subjectively *knew* that
Plaintiff had a fractured hip and *disregarded* a risk to Plaintiff
when they immediately escorted Plaintiff to the medical building
after he was tackled.   Plaintiff admits that he was on his feet
as he was taken to the medical department (Doc. 17 at ¶ 8).   In
fact, the immediate escort of Plaintiff to the medical department
indicates that Defendants Smart, Easter, and Walker attempted to

temper the severity of their use of force when Plaintiff was tackled.  Plaintiff does not assert that dragging his right leg behind him during the escort to the medical building exacerbated or caused the injury to his hip.  Likewise, although he does assert that he screamed that his leg was broken, he has not demonstrated that any defendant was actually aware that Plaintiff had fractured his hip when he was tackled by Defendant Smart.  See Farmer v. Brennan, 511 U.S. 825, 838 (1994) ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as [a constitutional violation].");  John v. Berry, 469 F.Supp.2d 922 (W.D. Wash. 2006) (no deliberate indifference when policeman made Plaintiff walk to his patrol car instead of providing him with a stretcher when it was later discovered that the plaintiff's knee was fractured because there was no evidence of the defendant's intent to delay, deny or interfere with the plaintiff's medical treatment);  Walker v. Butler, 967 F.2d 176 (5th Cir. 1992) (no deliberate indifference when prison guard had prisoner walk between 150 and 440 yards to the hospital on broken ankle because the defendant did not know that the ankle was broken and defendant escorted the plaintiff to the hospital).

Consequently, based upon the record before the Court, the undisputed material facts, and the applicable law, the Court concludes that Defendants Smart, Easter, and Walker are entitled

to summary judgment on Plaintiff's deliberate indifference claim as a matter of law.

### C. Defendant Lamour is entitled to summary judgment as a matter of law on Plaintiff's deliberate indifference claim

#### 1. Material Facts

The facts surrounding Plaintiff's medical deliberate indifference claim against Defendant Lamour are largely undisputed. Plaintiff admits that he was examined by Defendant Lamour shortly after the use of force incident on March 12, 2009 and that Dr. Lamour ordered that Plaintiff to be taken to Desoto Memorial Hospital for examination of his hip (Doc 76 at 8; Doc. 84 at 4). Plaintiff was examined at Desoto Memorial Hospital where x-rays were taken. Id. The staff at Desoto Memorial Hospital diagnosed Plaintiff with hip contusions, and because he did not have the x-ray film for review, the diagnosis was relied upon by Defendant Lamour. Id.

Upon Plaintiff's return to the FCCC at approximately 12:10 a.m. on March 13, 2009, he was seen in the infirmary, and Defendant Lamour was called at home and advised of the situation (Doc. 76 at 8; Doc. 84 at 4). Defendant Lamour approved the use of pain relievers, and Plaintiff was given a second mattress for sleeping. Id. Plaintiff refused to let the nurse at the FCCC examine his injured hip and refused to answer questions posed by the nurse at that time. Id. At 2:15 a.m. on March 13, 2009, Plaintiff asked

for a pain reliever, but refused to take it when told by staff that any pain medication would be crushed. Id.

The next afternoon, at approximately 3:00 p.m., the FCCC received a call from Desoto Memorial Hospital whereby the facility was advised that a mistake had been made regarding the hospital's interpretation of the x-ray and that Plaintiff had a fractured hip (Doc. 76 at 9; Doc. 84 at 4). However, the hospital did not provide the FCCC with the written radiological report at that time. Id. Plaintiff requested pain relief at 1:15 a.m. on March 14, 2009, and Tylenol with Codeine was provided to Plaintiff at 1:30 a.m. whereby Plaintiff slept for the remainder of the nurse's shift. Id.

The written report from Desoto Memorial Hospital confirming the diagnosis of the fractured hip was received via facsimile by the FCCC on March 14, 2009 at 4:43 p.m. (Doc. 76 at 9, Doc. 84 at 5). Thereafter, Plaintiff was transported to Tampa General Hospital at 7:00 p.m. on March 14, 2009. Id. Plaintiff underwent surgery to his right hip four days later on March 18, 2009. Id. The surgery was successful, and Plaintiff does not walk with a limp. Id.

Plaintiff attests that he suffered adversely from Defendant Lamour's failure to seek Plaintiff's timely transport to Tampa General Hospital because he was forced to have a stent put in his

leg to "catch any blood clots" caused by the delay. (Plaintiff's Second Aff. at ¶ 4).

### 2.  Application of law to facts

A review of the undisputed facts and the medical records submitted by both Plaintiff and the defendants fails to reveal any deliberate indifference on the part of Defendant Lamour to Plaintiff's hip injury, Plaintiff's need for treatment, or Plaintiff's complaints of pain.  Plaintiff does not deny that he initially received immediate attention to his hip injury or that his complaints of pain were ignored.  Plaintiff acknowledges that he was examined immediately after the use of force incident and that he was sent to Desoto Memorial Hospital the same day.  In addition, Defendant Lamour approved, and Plaintiff received, pain medication and an additional mattress while he was at the FCCC. Accordingly, Plaintiff's constitutional claim against Defendant Lamour appears to be based solely upon the delay between Desoto Memorial Hospital's telephone call to the FCCC informing of Plaintiff's fracture and Plaintiff's transfer to Tampa General Hospital.

Where, as here, medical care is ultimately provided to a plaintiff, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining whether

the delay is constitutionally intolerable. See Brown v. Hughes, 894 F.2d 1533, 1537–39 (11th Cir. 1990). A plaintiff seeking to show that a delay in medical treatment rose to a constitutional violation "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." Hill, 40 F.3d at 1188.

In this case, Defendant Lamour has submitted an affidavit in which he attests that Plaintiff received his surgery four days after he was transported to Tampa General Hospital; that Plaintiff does not walk with a limp; and that he (Defendant Lamour) has not been informed by anyone that a delay in transporting Plaintiff to Tampa General Hospital worsened Plaintiff's condition (Lamour Aff. at ¶¶ 33, 34, 41, 44). Plaintiff attests that his condition was worsened by the delay in transportation to Tampa General Hospital because "Tampa General surgeons place [sic] a stent in plaintiff to catch any blood clots that may have been present do [sic] to Lamour's delay in seeking medical treatment, and plaintiff was put into traction." (Plaintiff's Second Aff. at ¶ 4). In his motion for partial summary judgment, Plaintiff has included an October 18, 2009 "Operative Note" from Tampa General Hospital which describes Plaintiff's successful surgery and notes that "[t]he patient received an IVC filter for DVT prophylaxis because of delayed initiation of anticoagulation." (Doc. 74-3).

Despite Plaintiff's assertion otherwise, nothing in the record suggests that the delay from Defendant Lamour's decision to wait for written confirmation of Plaintiff's injuries "caused" the necessity of an IVC filter – indeed, the Operative Note from Tampa General was written four days after Plaintiff was sent to Tampa General Hospital with no indication of the date on which the filter was placed or any statement as to the operative time period for anticoagulation treatment.  The note does not state that the four day delay in Plaintiff's surgery *after* his transport to Tampa General was related to Defendant Lamour's delay in arranging transport to Tampa General.  In addition, there is no "verifying medical evidence" in the record establishing that the use of the IVC filter could have been avoided if Defendant Lamour had sent Plaintiff to Tampa General Hospital immediately upon learning of Desoto Memorial Hospital's misdiagnosis.  Moreover, Plaintiff's medical records indicate that the surgery on his hip was a success.  Therefore, Plaintiff has failed to establish by "verifying medical evidence" that any detrimental effect was caused by the delay in his transport to Tampa General Hospital. Hill, 40 F.3d at 1188.

Because Plaintiff has failed to place evidence in the record showing the detrimental effect of the delay in medical treatment, his claims that his constitutional rights were violated by Defendant Lamour's decision to await a verifying written report

from Desoto Memorial Hospital before sending him to Tampa General Hospital is without merit.

Finally, "[t]he tolerable length of delay in providing medical attention" also depends on the reason for the delay. Hill, 40 F.3d at 1188. Defendant Lamour has submitted an affidavit in which he attests:

> In my professional judgment, it is sound to rely on a written report rather than an oral rendition of a finding in order to assure the accuracy of what may have been told to FCCC staff by Desoto Memorial in a telephone conversation. In my experience, the possibility exists for the parties in a verbal conference to have mis-communication or a misunderstanding as to a medical finding which is a reason to confirm the actual finding with the written report.

(Lamour Aff. at ¶ 26-27). Plaintiff argues that Defendant Lamour did not need the written report before sending Plaintiff to Tampa General Hospital for surgery, and therefore, the delay between the phone call from Desoto Memorial Hospital and Plaintiff's transport to Tampa demonstrates deliberate indifference on the part of Defendant Lamour (Doc. 84 at 5). However, Plaintiff has presented no evidence that the delay was *intended* to cause him suffering or to exacerbate his injury. To the contrary, Dr. Lamour has attested that the delay was to ensure accuracy of the verbal communication, an assertion that Plaintiff has not been able to refute.

Consequently, based upon the record before the Court, the undisputed material facts, and the applicable law, the Court

concludes that Defendant Lamour is entitled to summary judgment on Plaintiff's deliberate indifference claims as a matter of law.

ACCORDINGLY, it is hereby

**ORDERED:**

1.    Plaintiff's motion for partial summary judgment against Defendant Lamour (Doc. 74) is **DENIED**;

2.    The motion for summary judgment filed by Defendants Smart, Easter, Walker, and Lamour (Doc. 76) is **GRANTED**; and

3.    With no remaining claims or defendants, the **Clerk of Court** is directed to terminate any pending motions, close this case, and enter judgment accordingly.

**DONE** and **ORDERED** in Fort Myers, Florida on this ___12th___ day of November, 2014.

_____

JOHN E. STEELE
UNITED STATES DISTRICT JUDGE

SA: OrlP-4
Copies: All Parties of Record

– 34 –